1

2

3

4                      UNITED STATES DISTRICT COURT

5                     NORTHERN DISTRICT OF CALIFORNIA

6

7    DUNG THE PHAM,

             Petitioner,                     No. C 02-1348 PJH

8

9            v.                              **ORDER GRANTING PETITION FOR**
                                             **WRIT OF HABEAS CORPUS**
10   C.A. TERHUNE, in his capacity as
     head of the California Department of
11   Corrections,

12           Respondent.
     _____/
13

14        Before the court is the petition for writ of habeas corpus filed by state prisoner, Dung

15   The Pham ("Pham"), pursuant to 28 U.S.C. § 2254.  Having reviewed the record and the

16   parties' papers, and having carefully considered their arguments and the relevant legal

17   authorities, the court GRANTS the petition for the reasons that follow.

18                                    **BACKGROUND**

19   **A.    Procedural History**

20        Following a jury trial, Pham and Son Hoang Nguyen ("codefendant Nguyen") were

21   convicted by a jury of first degree murder under California Penal Code §§ 187 and 189.

22   Pham was sentenced to twenty-five years to life in prison.  Both Pham and Nguyen

23   appealed to the California Court of Appeal, which affirmed their convictions.  The California

24   Supreme Court subsequently summarily denied Pham's petition for review.

25        Pham then filed a petition for writ of habeas corpus with this court on March 19,

26   2002.  On May 8, 2002, the court granted Pham's request to hold the petition in abeyance

27   while he exhausted two unexhausted claims in state court.  In accordance with this court's

28   stay order, Pham filed a petition for writ of habeas corpus with the California Supreme

     Court, which was summarily denied on February 11, 2003.

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1    Pham then filed an amended petition for writ of habeas corpus with this court on

2  March 2, 2003, raising three claims, including that:  1) his trial counsel rendered

3  ineffective assistance by failing to obtain criminalist Mario Soto's lab notes and by failing to

4  retain his own expert witness regarding a gunshot residue ("GSR") test that was conducted

5  on another suspect;  2) the state unconstitutionally suppressed Soto's lab notes under

6  *Brady v. Maryland*, 373 U.S. 83 (1963); and 3) the jury instructions utilized by the trial court

7  were unconstitutional because they allowed the jury to convict Pham of first degree murder

8  without finding premeditation.  On October 20, 2003, this court denied Pham's petition and

9  also denied his request for discovery of Soto's lab notes and raw data.

10    On November 20, 2003, this court granted Pham's request for a certificate of

11  appealability ("COA") on his *Brady* claim, but denied the COA as to the other two claims.

12  Pham subsequently appealed the *Brady* claim to the Ninth Circuit.  On March 7, 2005, the

13  Ninth Circuit reversed the decision on the *Brady* claim, holding that this court erred in

14  denying Pham's request for discovery, and that the resolution of his *Brady* claim required

15  disclosure of the suppressed evidence, Soto's lab notes.  *Pham v. Terhune*, 400 F.3d 740,

16  743 (9th Cir. 2005).  The Ninth Circuit remanded the case to this court to order disclosure

17  of the lab notes and "for further proceedings consistent with this opinion."  *Id.*

18    Following remand, on April 8, 2005, the court issued an order reopening the case,

19  requiring the state to disclose Soto's lab notes and raw data regarding his GSR analysis,

20  and requiring supplemental briefing on the *Brady* issue following disclosure.  Pursuant to

21  that order, the state provided Pham with Soto's lab notes and raw data.   Pham filed an

22  opening supplemental brief and related exhibits on September 9, 2005.  The state filed its

23  supplemental brief and related exhibits on January 13, 2006.  After several extensions and

24  a mistake related to Pham's addition of new counsel, Pham did not file his reply until May

25  12, 2006.

26    In that May 12, 2006 reply, Pham requested further discovery.  Specifically, he

27  sought disclosure of the gunshot residue sample itself for review and testing by his own

28  expert.  Pham noted that Soto's lab notes, which had been recently disclosed to him on

remand, indicated that Soto had only tested 59% of the GSR sample.  Pham sought disclosure of the GSR sample so that he could employ an expert to test the sample in its entirety.  The state subsequently filed its May 19, 2006 surreply opposing Pham's request for production of the GSR sample, and arguing that Soto's examination of 59% of the GSR sample was in accordance with forensic practices.  Pham filed a response to the surreply on May 26, 2006.

On July 17, 2006, the court granted Pham's request for production of the GSR sample, and allowed him the opportunity for review and testing of the sample by his own expert.  The court also ordered another round of supplemental briefing following his expert's examination.  Pham's expert completed her testing of the GSR sample on October 6, 2006, and Pham filed his second supplemental brief on October 30, 2006.  The state filed its response on January 29, 2007.  On March 8, 2007, Pham filed his reply.  On March 9, 2007, the state filed a notice of withdrawal of an argument made in its January 29, 2007 supplemental brief.

**B.      Factual Background**

On May 22, 1996, the victim, Tong Van Nguyen, was chased down and shot by two gunmen in a cafe parking lot in San Jose, California.  Both the state and Pham agree that Tien Ha ("Mole"), who remains a fugitive, was one of the two gunmen.  Pham was convicted of being the other gunman but he contends that the other gunman was a former suspect, another teenager at the scene of the crime, Tuan Hoang ("Hoang").

The evidence at trial revealed that on the day of the shooting, a large group of teenagers, many of whom were friends or acquaintances of Pham and codefendant Nguyen (no relation to victim Tong Van Nguyen) (the "teenage acquaintances"), gathered at the cafe.  John Nguyen, the victim's brother, and several other witnesses were also near the cafe at the time of the shooting.  Although the state concedes that many of the teenage acquaintances lied about what they witnessed, both in pretrial statements and at trial, it nevertheless argues that a consistent picture of events emerged from the evidence.

According to the state, Pham and Mole saw the victim and cursed at him the day

3

United States District Court
For the Northern District of California

1    before the shooting.[1]  The next day, codefendant Nguyen helped Pham and Mole procure

2    weapons, thus exposing himself to an aiding and abetting charge.  Pham and Mole then

3    went to the cafe with some of the teenage acquaintances.  At the cafe, Pham and Mole

4    saw the victim and began chasing him on foot in the parking lot.  Pham, Mole, and the

5    victim then disappeared behind a parked van, after which several shots were fired,

6    apparently from two different guns.  Upon hearing the shots, the cafe patrons ran outside,

7    entered their cars and quickly drove away.  The victim died before the police arrived.

8         During Pham's trial, the state argued that he was guilty of first degree murder based

9    on one of two theories: that he was the direct perpetrator of a premeditated shooting; or, in

10   the alternative, that he aided and abetted an assault for which murder was a natural and

11   probable consequence.

12        The state's case was based primarily on eyewitness testimony.  It offered testimony

13   from the victim's brother and several of the teenage acquaintances as proof of Pham's

14   guilt.  At trial, John Nguyen, the victim's brother, identified Pham as one of the gunmen.

15   Exh. 2, Reporter's Transcripts ("R.T."), at 346:23-25.  The state also introduced a

16   statement to police from Thanh Ha Nguyen ("Cindy"), that, following the shooting, at the

17   home of one of the teenage acquaintances, Pham and Mole admitted to the shooting.[2]

18   Exh. 1, Clerk's Transcript ("C.T."), at 875.  In addition, the state offered other evidence, in

19   the form of taped statements given to the police, and testimony from some of the other

20   teenage acquaintances that Pham and Mole admitted to participating in the shooting, by

21   either stating so directly, or by adopting admissions made in their presence.  C.T. 917; 923

22   925-926; 996-1008, 1014-1016; R.T. 1480, 1951-1957.  The state also introduced

23   fingerprint evidence that established Pham's presence in the cafe, R.T. 488-489, and

24   Mole's presence inside of Pham's car.  R.T. 1736-1737.

25

26        [1]Pham sought to introduce allegations of the victim's gang activity at trial.  The trial court
     excluded those allegations from evidence, however, finding that they were more prejudicial
27   than probative.

28        [2]The record is unclear as to what Pham actually said after the shooting.  According to
     the California Court of Appeal, Pham adopted Mole's admission that he and Pham shot the
     victim.

**United States District Court**
For the Northern District of California

1    At trial, Pham denied admitting to the murder.  He relied primarily on the defense of

2    mistaken identity, claiming that the second gunman was in fact Hoang, a former suspect

3    and another one of the teenage acquaintances.  The police had arrested Hoang the night of

4    the shooting and initially charged him with the murder.  Upon Hoang's arrest, the police

5    performed a gunshot residue test on him, which was analyzed by Santa Clara County

6    criminalist, Mario Soto.[3]  Soto's report stated that the results of the GSR test were

7    inconclusive, and that although Hoang may have fired a weapon, Soto could not be sure.[4]

8    At trial, the defense did not present a GSR expert, but did call Soto as a witness.

9    The court qualified Soto as an expert on GSR.  R.T. 2250:23-24.  Soto testified that GSR

10   analysis is based on the presence of lead, barium, and antimony.  R.T. 2252:14-28;

11   2263:9-10.  He further testified that the presence of particles containing titanium and

12   antimony found on Hoang were inconsistent with GSR.  R.T. 2258:8.  Soto stated that he

13   considered a total of six particles in analyzing Hoang's GSR test, R.T. 2404:9-28, and

14   determined that the GSR test on Hoang was inconclusive because the presence of

15   particles inconsistent with GSR indicated a possibility that the particles found on Hoang

16   came from other environmental sources.  R.T. 2266:2-7.  Additionally, Soto noted that even

17   if the particles were conclusively GSR, it would not conclusively prove that Hoang fired a

18   gun; it would only prove that Hoang had either been present when a gun was fired or

19   handled a gun that had been fired.  R.T. 2421:12-14.  Soto ultimately concluded that,

20   "particles that were consistent with but not unique to [GSR] were found, and that to me is

21   inconclusive."  R.T. 2410:16-17.

22   **C.    Post-Remand Evidentiary Submissions**

23   **1.    First Round Supplemental Briefing ("1SB")**

24   Following remand from the Ninth Circuit, the state disclosed Soto's lab notes to

25   Pham, which consisted of 53 pages and contained, among other things, the raw data for all

27   [3]Pham was not arrested until much later, so no gunshot residue test was performed on
him.

28   [4]Soto also analyzed a second GSR test, taken from a suspect named Nhue Vy Giang,
at the time of Hoang's test.  R.T. 2403:13-15.

particles taken from Hoang and analyzed by Soto.  See Pham's 1SB, Exh. A, AGO-01 through AGO-53.  The parties then submitted their first supplemental briefs and supporting declarations.  In support of his 1SB, Pham submitted a declaration from Ken Moses, his forensic expert, which consisted of Moses' analysis of the raw data and his opinion regarding Soto's report and testimony.  In response, the state submitted a declaration from Robert Hinkley ("Hinkley Decl."), the state's forensic expert, which included Hinkley's opinions regarding the raw data contained in Soto's notes, Moses' qualifications and Moses' opinions, and Soto's qualifications and opinions.

In terms of his qualifications, Moses claims to have over 35 years experience in the analysis of firearms evidence, which includes GSR collection and analysis.  Moses Decl. ¶ 1.  He acquired GSR collection and analysis experience as an investigator with the San Francisco Police Department Crime Laboratory and as a director of a company, Forensic Identification Services.  *Id.* ¶ 3.

After reviewing the data contained in Soto's lab notes, Moses offered his own analysis of the scientific significance of the particles found on Hoang, and refuted Soto's conclusion that Hoang's GSR test contained particles inconsistent with GSR.  Moses ultimately concluded, based on the data contained in Soto's lab notes, that:

> [T]he combination of heavy metals found . . . is an indication that the particles were the result of gunshot residue and not environmental sources.  Even though each of these elements individually could be the result of environmental sources, the finding of all these heavy metal particles together leans more heavily toward the conclusion that the particles are gunshot residue.

*Id.* ¶ 20.

In response to Moses' declaration, Hinkley asserted that Soto's trial testimony was correct, and challenged Moses' qualifications, and the methods Moses utilized in reaching his conclusion that the particles taken from Hoang were likely GSR.   While Hinkley acknowledged Moses' expertise in fingerprint and crime scene analysis, he claimed that Moses lacked training and/or experience in the type of particle analysis conducted as part of Hoang's GSR test.  Specifically, Hinkley claimed that Moses lacked a background in scanning electron microscopy and energy dispersive X-ray analysis, the method used by

6

United States District Court
For the Northern District of California

1   Soto in analyzing Hoang's GSR test.

2        Hinkley also refuted Moses' conclusions regarding Soto's lab notes.  According to

3   Hinkley, Moses' assertion that titanium or antimony from a firearm could be present in GSR

4   was scientifically inaccurate.  Hinkley concluded, after completing his review of the lab

5   notes and Soto's testimony and report, that Soto's statements and conclusions were

6   accurate based on the raw data in the lab notes.

7        However, because both Moses' and Hinkley's expert opinions, offered in conjunction

8   with the parties' 1SBs, were based solely on Soto's analysis of only 59% of the GSR

9   sample, they are of limited evidentiary value given the subsequent developments in this

10  case.

11            **2.      Second Round Supplemental Briefing ("2SB")**

12       Following this court's July 17, 2006 order granting Pham's request for production of

13  the GSR samples, Pham employed Celia Hartnett to test 100% of the GSR sample, which

14  included the 59% tested by Soto and the other 41% not previously tested.  Hartnett is a

15  forensic scientist and lab director at the Forensic Science Division at Forensic Analytical.

16  She has over thirty-three years of experience in the field, and has previously testified as an

17  expert in the collection, analysis, and interpretation of GSR evidence in state court.

18       Hartnett tested the GSR kits collected by the SJPD for both Tuan Hoang and Nhue

19  Vy Giang.[5]  She concluded, contrary to Soto, that the sample collected from Hoang's left

20  hand "contained molten particles comprised of lead, antimony, and barium," which were

21  "*highly* specific to GSR," or, in other words, "unique" to GSR.  Hartnett Decl., Exh. B.[6]  She

22  concluded that Hoang's right hand "contained particles of lead only," which is "consistent

23  with GSR."

24       The state does not dispute Hartnett's findings and conclusions; nor has it challenged

25

26       [5]It is not clear to the court why Hartnett also tested Giang's kit.  Pham's defense was
    never that Giang was the other gunman, and Giang has never been at issue in conjunction
27  with this petition.  Accordingly, Hartnett's evaluation of and opinions regarding Giang's GSR
    test are not relevant to the issues currently before the court.

28       [6]Soto testified at trial that if he had found those particular elements in his testing, then
    he (like Hartnett) would have ruled out an environmental source for the GSR.

7

United States District Court
For the Northern District of California

1   her expertise or qualifications.  Instead, the state challenges the reliability of Hoang's GSR

2   sample, whether the materials were actually suppressed, and also reiterates several of its

3   prior arguments regarding the materiality and exculpatory nature of the evidence.  In

4   support of its 2SB, the state submitted several unauthenticated exhibits that are simply

5   stapled to its brief, including what appears to be an article from a forensic science journal

6   (Exh. 5), an article from a science magazine (Exh. 7), and a portion of a transcript from

7   testimony that Hartnett gave in a state court criminal case (Exh. 6). [7]  The state also

8   submitted declarations from two San Jose Police Department (SJPD) officers, one who was

9   present when Hoang and Giang were arrested, and another officer who took the GSR

10  sample from Hoang.

11  **D.     Pham's Trial Counsel's Requests for Soto's Lab Notes and Raw Data**

12       In its October 20, 2003 order denying Pham's petition and request for discovery,

13  this court considered whether Pham had shown good cause for discovery of Soto's lab

14  notes under Federal Habeas Rule 6(a).  In determining that Pham had not shown good

15  cause, the court stated that it "would be inclined to grant Pham's request for discovery" if

16  the request had not arisen in the context of a petition for writ of habeas corpus.  Order at

17  13. The court noted that because this was a habeas case, it was not entitled to substitute

18  its judgment for that of the state court, and instead "was required to afford more stringent

19  deference to the state appellate court, which upheld suppression of the lab notes, than that

20  of an appellate court reviewing the decision of a trial court on direct appeal." *Id.*

21       It is undisputed that prior to trial, the prosecution provided both Pham's trial counsel,

22  Schwartz, and codefendant Nguyen's trial counsel, Morales, with copies of Soto's report.

23  *See* Resp. 2SB, Exh. 2, June 5, 1996 Report.  However, on appeal of this court's order

24  _____

25       [7]Because the state failed to properly authenticate the exhibits, the source of the articles is not entirely clear to the court.  In addition to failing to authenticate the exhibits, the state also

26  failed to explain *how* the particular exhibits support its position.  The court notes that the state is not alone in its violation of the Federal Rules of Evidence.  Both parties have submitted

27  numerous exhibits with their supplemental briefs, which are simply attached to their briefs, rather than to a declaration or a request for judicial notice.  Although all improperly filed

28  exhibits should be stricken, given the ultimate result of this petition, the absence of prejudice to either party, and the absence of objections by either party, the court has reviewed and considered all exhibits.

United States District Court
For the Northern District of California

denying discovery of the lab notes, a factual issue arose regarding whether or not Pham's

counsel requested disclosure of the lab notes from the trial court, and whether or not the

trial court had ruled on the issue.  This confusion appears to have been invited, at least in

part, by Pham's counsel, who misrepresented the state court record in response to a

question from a Ninth Circuit judge at the oral argument on appeal.  The relevant colloquy

regarding the lab notes is as follows:

> JUDGE 1: Now he [trial counsel] asked for them [lab notes] informally.  The district judge here say[s] that he sought – unsuccessfully sought a court order.  But I saw nothing in the record to show that he sought a court order.
>
> MR. GARDNER: *And that's right.  The district judge just made a blunder on that.  I don't think counsel will argue anything differently.*
>
> JUDGE 1: I saw the informal request in the record, and I see nothing beyond that in the sense of attempt to get a court order.  I think it just didn't happen.  In his later affidavit when he [trial counsel] says, "It's not in the file.  That probably means I never got it."  And he makes no mention of having tried to get a court order.
>
> MR. GARDNER: The district court's error comes from a declaration I submitted.  And in explaining the course of my attempts to get it I said I asked for it after my informal request.
>
> JUDGE 1: I see so she just flipping who —
>
> MR. GARDNER: She just flipped —
>
> JUDGE 1:  — asked for what?
>
> MR. GARDNER: Exactly, Your Honor.

September 17, 2004 Ninth Circuit Oral Argument Transcripts, at 8 (emphasis added).

The Ninth Circuit appears to have relied on petitioner's counsel's misrepresentation

of the record, and in its remand order, stated:

> Under the misapprehension that the state court had refused to issue an order requiring disclosure of the notes, the district court concluded that it was required 'to afford more stringent deference to the state appellate court, which upheld suppression of the lab notes, than that of an appellate court reviewing the decision of a trial court on appeal.'  The district court erred in applying this "stringent deference" to Pham's Rule 6(a) claim because there was no state court decision refusing to order production of the notes.  Pham's trial counsel informally requested the notes from the state both before and after trial *but never sought a court order to obtain them.*

400 F.3d at 742-43 (emphasis added).

9

United States District Court
For the Northern District of California

Pham's version of the relevant facts shifts from his opening 2SB to his 2SB reply.  In his opening 2SB, Pham asserted that the Ninth Circuit "got it right" in concluding that his trial counsel simply asked the prosecution for Soto's notes but did not seek a court order to obtain them when the state refused to provide them.  Opening 2SB at 18.  He then argues that his counsel's failure to use "court process to obtain the notes" when the state did not turn them over pursuant to his letter constituted deficient performance.

However, in his 2SB reply, Pham sets forth a lengthy history of the pretrial and trial proceedings, and admits that his trial counsel, Schwartz, did indeed file a motion with the trial court seeking disclosure of Soto's notes, a position that is contrary to his position before the Ninth Circuit that this court "blundered."  2SB Reply at 9.  This is confirmed by review of the record.

The record before this court previously demonstrated and continues to demonstrate that Pham's trial counsel, Schwartz, first requested disclosure of Soto's notes in a September 10, 1997 informal pretrial letter request pursuant to California Penal Code §§ 1054 *et seq* .  Subsequently, on October 27, 1997, codefendant Nguyen's trial counsel, Morales, also requested material relevant to the GSR tests, and advised the prosecution that he would seek a subpoena for the information if it was not disclosed.  On October 29, 1997, the prosecution provided both Schwartz and Morales with an expert witness list that included Soto's name.

Presumably, the state did not disclose Soto's notes to either Schwartz or Morales in response to their respective September and October 1997 letters.  On or around November 3, 1997, Morales sought a subpoena duces tecum for Soto's notes.  Unfortunately, neither the prosecutor, Soto, nor Morales have any recollection regarding whether Soto ultimately turned over his notes to Morales.  Morales similarly has no recollection whether, if provided with the notes, he turned them over to Pham's trial counsel, Schwartz.

Unlike Morales, Pham's trial counsel, Schwartz, did not seek a subpoena duces tecum, but instead, on November 14, 1997, filed his motions in limine with the trial court, in which he requested a number of discovery items, pursuant to *Brady* and California Penal

United States District Court
For the Northern District of California

1  Code § 1054.1, including "all reports, notes, and statements of experts the prosecution

2  intends to call" and "what each expert bases his/her opinion upon."  C.T.  479.  The trial

3  court heard the parties' motions in limine on November 18, 1997, prior to trial.

4      At that hearing, regarding Pham's motion for discovery, the court asked the

5  prosecution "Now with respect to the *Brady* reference, is there any exculpatory evidence at

6  all to be elicited that you haven't given to the defendant?," to which the prosecution replied,

7  "No."  R.T. 17.  The court then asked Schwartz whether "discovery [was] complete as far as

8  you're concerned."  *Id.*  Schwartz stated that the prosecution "was kind enough to provide

9  some of the discovery on his [motions in limine] list yesterday."  Schwartz then indicated

10 some confusion regarding who the state was calling as expert witnesses, though.  It is

11 unclear how that confusion was resolved because the trial court then addressed Morales'

12 motion to sever on Nguyen's behalf (which it denied), and afterward, simply stated that "the

13 witness lists are out of the way now."  R.T. 22.

14     The trial court subsequently confirmed that the expert "reports" (not necessarily the

15 underlying notes or raw data) had been submitted to counsel, including those of the Santa

16 Clara County Crime Lab, where Soto worked.  *Id.*  The court also asked defense counsel

17 whether there was any problem with the information disclosed, to which Morales and

18 Schwartz both replied "no."  *Id.*

19     Thereafter, in state habeas proceedings, Pham sought an order from the California

20 Supreme Court requiring the state to disclose the lab notes.  *See* Exh. 12 at 25; Amend.

21 Pet. Ex. B at 3.  Specifically, Pham, in his petition for writ of habeas corpus, asked for an

22 order requiring disclosure of the lab notes and for an additional 60 days to file an amended

23 state court petition.  *See* Ex. 12 at 25.  The California Supreme Court summarily denied

24 Pham's habeas petition and refused to order disclosure of the lab notes.

25     In sum, careful review of the record demonstrates that Pham's trial counsel did

26 indeed seek disclosure of Soto's reports, notes, and statements before the trial court –  in

27 addition to his informal request for the documents in a letter to the prosecution.  *See* C.T.

28 479.  However, the record remains unclear regarding whether the trial court explicitly ruled

**United States District Court**
For the Northern District of California

1   on the issue, and if so, what that ruling was.  Accordingly, the Ninth Circuit's conclusion that

2   Pham's trial counsel did not seek court-ordered disclosure of Soto's notes is contradicted

3   by Pham as well as the record evidence, but not its related conclusion that there was no

4   state court decision refusing to order production since it is unclear from the record how and

5   if the state court ruled on Pham's request.  As discussed subsequently in this order, the

6   state now suggests that a trial court ruling on the issue may have been unnecessary

7   because, for the first time ever, it contends that Soto did indeed disclose his lab notes.

8        Pham's trial counsel's efforts to obtain the lab notes, including counsel's motion in

9   limine filed with the trial court, are highly relevant to Pham's ineffective assistance of

10  counsel claim, and specifically to an evaluation of the deficient performance prong of the

11  Supreme Court's test set forth in *Strickland v. Washington*, 466 U.S. 668, 694 (1984).  For

12  this reason, the court has addressed the erroneous characterization of the record that

13  Pham's counsel invited on appeal.

14       Because the Ninth Circuit's conclusion based on Mr. Gardner's mischaracterization

15  of the record is clearly a *factual*, as opposed to a legal conclusion, the law of the case

16  doctrine does not apply and does not require this court to adhere to those mischaracterized

17  facts on remand.  *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816

18  (1988).  Nor is this court collaterally estopped from re-evaluating the factual issue since

19  there has been no final adjudication of the issue.

20                                    **ISSUES**

21       As noted, Pham's March 2, 2003 amended petition, denied by this court on October

22  20, 2003, raised three claims:  1) that his trial counsel rendered ineffective assistance by

23  failing to obtain Soto's lab notes and by failing to retain his own expert witness regarding

24  the GSR tests;  2) the state unconstitutionally suppressed Soto's lab notes under *Brady v.*

25  *Maryland*; and 3) the jury instructions utilized by the trial court were unconstitutional

26  because they allowed the jury to convict Pham of first degree murder without finding

27  premeditation.

28       Additionally, as noted, this court previously granted Pham's request for a COA to

                                      12

United States District Court
For the Northern District of California

1   appeal only the *Brady* claim.  Pham subsequently filed a motion with the Ninth Circuit to

2   expand the COA to include his claims for ineffective assistance of counsel and for violation

3   of his due process rights based on the jury instruction issue.  In its March 7, 2005 remand

4   order, the Ninth Circuit expanded the COA to include this court's denial of Pham's motion

5   for discovery under Rule 6(a), but declined to reach his motion to expand the COA to

6   include the ineffective assistance and jury instruction claims.  It noted that its "failure to

7   reach these motions at this time is without prejudice to their being made at a later time."

8   400 F.3d at 743.

9       The Ninth Circuit remanded the case to this court to permit discovery of Soto's lab

10  notes.  That discovery, and subsequent evidentiary developments, impact the court's

11  resolution of both Pham's *Brady* claim and his claim for ineffective assistance of counsel.

12  Accordingly, the court addresses both claims in this order.  However, the court's analysis

13  and resolution of Pham's jury instruction claim, as set forth in the court's October 20, 2003

14  order, remains unaffected by the post-remand discovery and related proceedings.  The

15  court therefore will not revisit its denial of jury instruction claim.

16                                          **DISCUSSION**

17  **I.      Standard of Review**

18      Previously, in the October 2003 order denying Pham's petition, the court applied

19  what has been referred to as a "relaxed" deferential standard to the California Supreme

20  Court's postcard denial of Pham's *Brady* and ineffective assistance of counsel claims.

21  Because the state court did not articulate the rationale for its determination and did not

22  analyze either claim under federal constitutional law, this court was unable to fulfill its

23  obligation to review the state court's application of clearly established federal law.  *See*

24  *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  The court noted that it was

25  accordingly required to conduct an independent review of the record and the relevant

26  federal law to determine whether the state court's decision was "contrary to, or involved an

27  unreasonable application of" clearly established law.  *Id.* at 982.

28      However, given the evidentiary development that has occurred post-remand and

                                              13

**United States District Court**
For the Northern District of California

1    following the two rounds of supplemental briefing, the court concludes that review of

2    Pham's ineffective assistance of counsel and *Brady* claims should be *de novo*.  *See*

3    *Monroe v. Angelone*, 323 F.3d 297-99 & n. 19 (4th Cir. 2003) (noting that where state

4    disclosed *Brady* material for the first time on federal habeas review, it was not possible to

5    defer to state court adjudication "because no state court considered all of the *Brady*

6    material considered here"); *cf. Holland v. Jackson*, 542 U.S. 649, 653 (2004) (in habeas

7    case involving ineffective assistance of counsel claim, noting Fourth Circuit's decision in

8    *Monroe*, but declining to reach the issue regarding standard of review).

9         Although the Ninth Circuit has yet to rule on this particular issue, it has indicated

10   under similar circumstances that *de novo* review is appropriate.  *See Killian v. Poole*, 282

11   F.3d 1204, 1208 (9th Cir. 2002).  In *Killian*, the habeas petitioner argued that his conviction

12   should be set aside based on the prosecution's knowing use of perjured testimony.  *Id.*

13   The district court conducted an evidentiary hearing on the issue.  *Id.*  On appeal, the Ninth

14   Circuit held that it was required to review the perjury claim *de novo*, and could not afford

15   AEDPA's deference to the state court decision because the state court did not have the

16   evidence of perjury, elicited at the federal court evidentiary hearing, before it at the time it

17   reached a decision on the merits.  *Id.*

18        Similarly, here the California Supreme Court did not have the information contained

19   in Soto's raw data and notes before it at the time of its decision.  Nor did the state court

20   have the results of Hartnett's subsequent GSR analysis or her conclusions.  Thus, this court

21   reviews the claims *de novo*.

22   **II.    *Brady* Claim**

23        **A.    Legal Standard**

24        "[T]he suppression by the prosecution of evidence favorable to an accused upon

25   request violates due process where the evidence is material either to guilt or to

26   punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady*, 373 U.S.

27   at 87.  A *Brady* claim has three components: "[t]he evidence must be favorable to the

28   accused, either because it is exculpatory, or because it is impeaching; that evidence must

14

**United States District Court**
For the Northern District of California

have been suppressed by the state, either wilfully or inadvertently; and prejudice must have

ensued." *Strickler v. Green*, 527 U.S. 263, 281-282 (1999); *see Banks v. Dretke*, 540 U.S.

668, 691 (2004).  Once constitutional error has been found under *Brady*, it cannot

subsequently be found harmless; the conviction must be set aside.  *See Kyles v. Whitley*,

514 U.S. 419, 436 (1995).

For the first component of the claim, evidence is exculpatory if it is "merely favorable

to the accused." *Gantt v. Roe*, 389 F.3d 908, 912 (9th Cir. 2004).  The evidence does not

have to affirmatively prove the defendant innocent; but must instead satisfy the "low,

favorable to the accused standard." *Id.*  Both exculpatory and impeachment evidence may

be favorable to the accused under the *Brady* standard.  *United States v. Bagley*, 473 U.S.

667, 676 (1985); *Benn v. Lambert*, 283 F.3d 1040, 1052 (9th Cir. 2002).  In addition,

exculpatory evidence includes evidence whose value allows a defendant to attack the

thoroughness and good faith of an investigation, albeit typically in cases where the

suppressed evidence is needed to impeach a government witness. *See Kyles*, 514 U.S. at

445; *see, e.g., Bagley*, 473 U.S. at 676-677 (government suppressed evidence that witness

received a promise that he would not be prosecuted in exchange for testimony); *Benn*, 283

F.3d at 1053 (state suppressed impeachment evidence of prosecution witness); *Paradis v.

Arave*, 240 F.3d 1169, 1175 (9th Cir. 2001) (state suppressed inadmissible handwritten

notes that could be used to impeach expert opinion).

For the second component, the state has no good faith or inadvertence defense to a

*Brady* claim; whether nondisclosure was negligent or by design, it is the responsibility of the

prosecutor.  *Gantt*, 389 F.3d at 912.  In addition, the prosecution has a duty to learn of any

exculpatory evidence known to others acting on the government's behalf.  *See Kyles*, 514

U.S. at 437-438.  The obligation to disclose exculpatory evidence under *Brady* and its

progeny "is the obligation of the government, not just the obligation of the prosecutor."

*United States v. Blanco*, 392 F.3d 382, 393 (9th Cir. 2004).  However, there is no

suppression where the government discloses all information necessary for the defense to

discover alleged *Brady* material on its own.  *United States v. Bracy*, 67 F.3d 1421, 1428-29

United States District Court
For the Northern District of California

(9th Cir. 1995).  Nonetheless, the fact that the defense failed to discover favorable evidence when it could or should have done so does not mean that such evidence has not been "suppressed."  *Gantt*, 389 F.3d at 912-913.

The terms "material" and "prejudicial" are used interchangeably to describe the third component.  *Bailey v. Rae*, 339 F.3d 1107, 1116 n. 6 (9th Cir. 2003);  *see also Benn*, 283 F.3d at 1053 n. 9 ("Evidence is not 'material' unless it is 'prejudicial,' and not 'prejudicial' unless it is 'material'").  "Prejudice" and "materiality" are interchangeable because the *Brady* standard for materiality is the same as the standard for determining prejudice in ineffective assistance of counsel claims.  *See Kyles*, 514 U.S. at 434 (court adopted "reasonable probability" standard for *Brady* claims from *Strickland*, 466 U.S. at 694); *Bagley*, 473 U.S. at 682 (*Strickland* formulation is sufficiently flexible to cover cases of prosecutorial failure to disclose favorable evidence); *Strickland*, 466 U.S. at 694 (appropriate standard to determine ineffective assistance of counsel prejudice is rooted in the test for materiality of exculpatory information not disclosed to the defense); *see also Downs v. Hoyt*, 232 F.3d 1031, 1038 (9th Cir. 2000) (citing *Strickland* and *Kyles* for the ineffective assistance of counsel "reasonable probability" standard); *Benn*, 283 F.3d at 1053 (*Brady* claim evaluated using the same standard as ineffective assistance of counsel claims).

The "touchstone of materiality is a 'reasonable probability' of a different result." *Kyles*, 514 U.S. at 434.  This reasonable probability is "shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* (quoting *Bagley*, 473 U.S. at 678).  Thus, "[a] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal," but must only establish that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Id.* at 434-435; *see also United States v. Golb*, 69 F.3d 1417, 1430 (9th Cir. 1995) (the ultimate question is whether there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different such that confidence in outcome is undermined); *Bailey*, 339 F.3d at 1118 (suppression of

16

**United States District Court**
For the Northern District of California

1   "linchpin" evidence left little confidence in outcome of trial).  The ultimate question for

2   materiality is thus whether "disclosure of the suppressed evidence to competent counsel

3   would have made a different result reasonably probable."  *Kyles*, 514 U.S. at 441.

4        Whether a "reasonable probability" exists may not be based on mere speculation

5   without adequate support.  *See Wood v. Bartholomew*, 516 U.S. 1, 6-8 (1995); *see also*

6   *Downs*, 232 F.3d at 1037 (rejecting as speculative an argument that withheld

7   material–namely, police leads, including pictures and names of suspects–might have led to

8   some admissible evidence that might have been sufficiently favorable to meet the *Brady*

9   standard); *Coleman v. Calderon*, 150 F.3d 1105, 1117 (9th Cir. 1998) (failure to disclose

10  evidence of other suspects in the crime not material because there was no direct or

11  circumstantial evidence linking the third persons to the perpetration of the crime).

12       A determination of materiality under the *Brady* standard requires the evidence to be

13  considered collectively.  *Kyles,* 514 U.S. at 434.  In addition, the materiality of the

14  suppressed evidence is considered with the evidence admitted at trial.  *See United States*

15  *v. Ross*, 372 F.3d 1097, 1107-1108 (9th Cir. 2004); *see also United States v. Agurs*, 427

16  U.S. 97, 112 (1976) (materiality of suppressed evidence must be evaluated in the context

17  of the entire record).  The materiality of suppressed evidence requires the court to gauge

18  the collective impact of the withheld evidence in terms of the strength of the prosecution's

19  case.  *See Barker v. Fleming*, 423 F.3d 1085, 1100 (9th Cir. 2005).   Thus, to determine

20  materiality, the exculpatory evidence must be considered with the evidence that was

21  actually considered at trial to determine whether or not the trial, in the absence of the

22  suppressed evidence, resulted in a verdict "worthy of confidence."  *Kyles*, 514 U.S. at 434.

23       **B.    State's Suppression of Soto's Notes and Raw Data**

24            **1.    Actual Disclosure**

25       In its 2SB, the state significantly shifts its position on a key factual issue, and now

26  argues that Pham has no *Brady* claim because it did not suppress Soto's raw data and

27  notes as it originally conceded that it did.  The state asserts that it is "duly embarrassed" by

28  the late discovery, but claims that a recent re-reading of Soto's trial testimony "calls into

United States District Court
For the Northern District of California

1   question the previously made assumption that the raw data and notes were not provided."

2   2SB at 3-4.  In support, the state points to Pham's codefendant's trial counsel, Morales'

3   direct examination of Soto.  R.T. 2255-56.

4   At trial, Morales called Soto as a defense witness.  Schwartz, Pham's trial counsel,

5   did not conduct any examination of Soto.  During Morales' direct examination of Soto, he

6   questioned Soto regarding information that even Pham concedes was not contained in

7   Soto's lab report, which was indisputably provided to both defense counsel.  The

8   information, however, can be found in Soto's notes and raw data.

9   The state argues that Morales' questions demonstrate that he possessed detailed

10   information available only from Soto's raw data and notes – as opposed to Soto's lab

11   report.  The state also notes that during Soto's cross-examination, Soto referred to his own

12   notes "at least five times before responding to [the prosecution's] questions."  2SB at 5.

13   The state then argues that Morales must have had a copy of Soto's notes because a trial

14   lawyer would not have allowed a witness to refer to notes of which he did not have a copy.

15   Pham concedes in his reply that Morales' examination of Soto demonstrates that

16   Morales was aware of facts outside of those contained in Soto's report.  However, Pham

17   does not concede that Morales therefore had Soto's notes and raw data.  Pham notes that

18   although Soto and Morales both admit to having met before Soto testified, neither can

19   recall whether Soto provided Morales with the notes and raw data.  Pham additionally

20   argues that even if Morales possessed Soto's notes and data, that does not mean that *his*

21   trial counsel, Schwartz, had Soto's notes.  Pham contends that it is not relevant what

22   Morales knew since his codefendant, Nguyen, is not seeking federal habeas relief in this

23   action.

24   Pham also argues that the record demonstrates that the state did not disclose Soto's

25   notes and raw data to his trial counsel, Schwartz.  First, he notes that the state has not

26   pointed to any evidence that the information was indeed disclosed.  He also notes that Soto

27   cannot recall whether his notes were provided to Schwartz, and that Schwartz has no

28   recollection of receiving the notes.  Furthermore, Pham points out that Schwartz's file did

**United States District Court**
For the Northern District of California

1   not contain Soto's notes.  Pham also asserts that the state has not explained why "if indeed

2   it disclosed Soto's notes before the 1997 trial, it steadfastly refused the courtesy of

3   providing a duplicate copy through both the state and federal court system for nearly six

4   years."

5       Pham further refutes the state's suggestion that the fact that Soto referred to his

6   notes during his testimony requires a conclusion that he must have provided Morales with a

7   copy of those notes.  He argues that all kinds of things happen during a "real trial," and that

8   it is not inconceivable that Morales never saw the notes to which Soto referred.

9       Finally, Pham argues that the state should not be allowed to change its position on a

10  concession that it made both before this court and before the Ninth Circuit, and that such a

11  shift is prohibited by both the law of the case and judicial estoppel doctrines.  Pham further

12  notes that if the state had properly disputed the factual issue years ago before the state

13  courts, he would have been entitled to an evidentiary hearing at that time.

14      This court has not undertaken any prior analysis with respect to this issue since the

15  state previously conceded in its briefs filed with this court, in its briefs filed with the Ninth

16  Circuit, and during its oral argument before the Ninth Circuit, that it had not disclosed Soto's

17  raw data and notes.  Although the trial court's inquiry at the pretrial hearing whether there

18  were any problems remaining with the expert disclosures and trial counsel's negative

19  response, suggest both that the court ordered such disclosure and that the notes had been

20  disclosed, the fact that state habeas counsel immediately sought disclosure of the notes

21  during habeas proceedings suggests the opposition conclusion.  This latter factor, along

22  with all those pointed out by petitioner, as well as this court's own review of the record,

23  have persuaded the court that a clear answer to whether the notes were actually disclosed

24  cannot be found in the record.  The court thus elects to rely on equitable principles to

25  determine whether the state may now take a position (that it disclosed the notes) contrary

26  to the position (that it did not disclose the notes) that it has maintained for years.

27      Judicial estoppel is an equitable doctrine that "is most commonly applied to bar a

28  party from making a factual assertion in a legal proceeding which directly contradicts an

earlier assertion made in the same proceeding or a prior one." *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990). It not only prevents a party from gaining an advantage by taking inconsistent positions, but is also intended to protect the integrity of the judicial system and to prevent a party from playing "fast and loose with the courts." *Hamilton v. State Farm Fire & Casualty Co.*, 270 F.3d 778, 782 (9th Cir. 2001). There are three factors that a court may consider in determining whether to apply the doctrine of judicial estoppel. *Id.* First, a party's later position must be "clearly inconsistent" with its earlier position. *Id.* Second, the party must have succeeded "in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position would create the perception [that the court was initially] misled." *Id.* Finally, judicial estoppel is appropriate if the party seeking to assert the inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Id.*

All three factors are present here. The state's current position is indisputably inconsistent. Second, both this court and the Ninth Circuit accepted the state's prior position. It is not necessary that the court have ruled on the precise issue to have "relied" on it. *See id.* at 783 (citing *Interstate Fire & Casuality Co. v. Underwriters*, 139 F.3d 1234, 1239 (9th Cir. 1998)). Here, based on the state's prior representations, neither this court nor the Ninth Circuit conducted any inquiry into whether or not the state actually suppressed the materials, but instead presumed that the issue should be resolved in Pham's favor. Finally, there can be no doubt that permitting a change of position would result in undue prejudice to Pham. Had the state been diligent in its analysis of the record six years ago when the case was before the state court on habeas review, Pham could have requested an evidentiary hearing to resolve the issue then. The witnesses and defense counsels' memories would have been fresher at that time.

### 2.     State's Duty to Disclose

In an argument misplaced in its discussion of the exculpatory nature of the evidence in its 2SB, the state argues that even if the notes and raw data were in fact suppressed by the prosecution, it was not required to disclose them as *Brady* material because Soto's raw

**United States District Court**
For the Northern District of California

1    data and lab notes were capable of interpretation and analysis only by a highly qualified

2    scientific expert.  It contends that the prosecutor would not have had actual or constructive

3    knowledge of the notes' and data's exculpatory value.  The state is unable to cite any

4    authority in support of its position, and all of the authority that the court has located is to the

5    contrary.

6         Ninth Circuit law is clear that *Brady* does not permit a good faith or inadvertence

7    defense.  *Gantt*, 389 F.3d at 912.  It applies even if the prosecution "fails to grasp the

8    significance" of the evidence.  *See id.*  Moreover, *Brady* applies to information that is not

9    even *known to* or in the prosecution's possession.  *See Strickler*, 527 U.S. at 281.  It simply

10   is not relevant for purposes of *Brady* that the prosecution in this case could not, or did not,

11   recognize the exculpatory value of the information contained in Soto's notes and/or raw

12   data.  This is particularly true where as here the defense did not simply request "*Brady*

13   material" but specifically requested the lab notes.

14            **C.    Exculpatory Nature of the Evidence**

15        In both its 1SB and its 2SB, the state confuses two of the distinct *Brady* prongs - the

16   exculpatory nature of the evidence and the materiality of the evidence.   In its 1SB, the

17   state addresses *only* the exculpatory nature of the evidence, and fails to address at all the

18   materiality of the evidence.  It does so in spite of the fact that it is *materiality* that typically

19   lies at the center of most *Brady* disputes.  *See, e.g., Bailey*, 339 F.3d at 1115 (materiality is

20   the "[c]ritical issue in any *Brady* claim").  However, upon closer review, many of the state's

21   arguments regarding the exculpatory nature of the evidence actually concern the *materiality*

22   of the evidence.  Accordingly, the court addresses these arguments below in conjunction

23   with the *materiality* prong.

24        Additionally, as discussed above, most of the parties' arguments in their 1SB

25   regarding Moses' and Hinkley's expert opinions and their effect on the exculpatory nature

26   or materiality of Soto's lab notes and raw data, are mooted by Hartnett's subsequent

27   analysis of 100% of the GSR sample and related evidentiary developments in this case, as

28   set forth in the parties' 2SB.

**United States District Court**
For the Northern District of California

1    In its 2SB, the state argues that Soto's raw data and lab notes are not in and of

2    themselves exculpatory because they required another step:  that Pham have the samples

3    retested by Hartnett.  In support, the state argues that it was it was scientifically correct for

4    Soto to test only 59% of the GSR samples based on the technology available to him in

5    1996.

6    In response, Pham notes that under Ninth Circuit law, this court should consider not

7    only the evidence actually suppressed, but "information the defendant reasonably could

8    acquire" after disclosure.  He therefore contends that disclosure of Soto's lab notes in this

9    case would have led to his discovery of the fact that Soto tested only 59% of the samples.

10   That discovery would in turn have led to the conclusion that retesting of the entire sample

11   was appropriate, and the retesting would have resulted in the conclusion that Hoang had

12   GSR on his left hand.

13   Contrary to the state's arguments, the lab notes and raw data need not in and of

14   themselves prove Pham's innocence.  *Bailey*, 339 F.3d at 1115.   As noted, there is a low

15   threshold for concluding that evidence is "exculpatory" under *Brady.*  The evidence need

16   only be "favorable to the accused," *Gantt*, 389 F.3d at 912, and includes evidence which

17   allows a petitioner to attack the thoroughness of an investigation.  *See Kyles*, 514 U.S. at

18   445.  Here, it is sufficient that Pham could have used the lab notes and raw data to

19   impeach Soto's methods.  *See id.*  Furthermore, even if the state is correct that Soto was

20   following standard 1996 protocol in testing only 59% of the sample and could not have

21   been impeached on that basis, disclosure of the raw notes and data still could have led to

22   the discovery of other admissible, material evidence.  *See United States v. Kennedy*, 890

23   F.2d 1056, 1059 (9th Cir. 1988).

24   Finally, the lab notes allow Pham to challenge the thoroughness of the state's

25   investigation, because Hartnett's conclusion supports Pham's theory that the police initially

26   had the correct person when they arrested Hoang, and that the investigation went the

27   wrong way after Pham was arrested.  Hartnett's conclusions unquestionably bolster Pham's

28   assertion that Hoang, and not Pham, was the second gunman.  For these reasons, the

1    court concludes that the notes and data are exculpatory under *Brady*.

2                    **D.    Materiality/Prejudice**

3         In his 1SB, Pham argues that the lab notes and raw data contained therein are

4    material because disclosure of the notes, when considered with other evidence of Hoang's

5    involvement in the shooting, would have put the case in such a different light that their

6    suppression undermines confidence in the outcome of the trial.  In support, Pham points to

7    weaknesses associated with the evidence presented at trial, including the victim's brother's

8    identification of him as one of the gunmen; the testimony of the teenage acquaintances;

9    and the testimony of other witnesses to the shooting.

10        Pham points first to his identification by the victim's brother, John Nguyen ("John").

11   Pham notes that John initially stated that he didn't get a good look at the second gunman,

12   R.T. 239:8, and even later identified codefendant Nguyen (instead of Pham) as the second

13   gunman. R.T.1808:17.  In spite of his initial statements, at trial, John subsequently changed

14   his story and identified Pham as the second gunman.  R.T. 359:6.

15        Pham then notes witness statements provided to police during their investigation of

16   the shooting, which directly conflicted with the witnesses' subsequent trial testimony.

17   Specifically, Pham notes that teenage acquaintances Cindy, Vu Nguyen ("Vu"), Hung Tran

18   ("Hung"), and Hoang initially told police that Pham had admitted to the shooting the night it

19   occurred.  *See* C.T. 875, 917; 923; 925-926; 996-1008; 1014-1016.  However, they later

20   recanted their prior statements, and at trial testified that they had no knowledge of Pham's

21   involvement in the shooting.  *See* R.T. 790:27 (Mole was the only person Cindy was

22   positive about admitting to shooting); R.T. 1319:2 (Vu denied hearing any admissions about

23   the shooting); R.T. 1484:27 (Hung stated that Pham didn't admit to the shooting).  Pham

24   further argues that Vu and Hung gave false statements to the police to exculpate Hoang

25   and inculpate Pham, and notes that their statements are consistent with Hoang's

26   involvement in the shooting.  *Id.* at 7-8.

27        In his 2SB, following Hartnett's subsequent testing of Hoang's GSR sample, Pham

28   notes that the lab notes and related testing reveal "an increased probability of Hoang's

**United States District Court**
For the Northern District of California

1    having fired a gun," which he asserts the Ninth Circuit implied would "not be immaterial"

2    under *Brady*.  Significantly, as noted above, the state does not dispute Hartnett's

3    qualifications or her conclusions.  It simply argues that even considering her conclusions,

4    Pham cannot show prejudice because, when they are considered along with the rest of the

5    evidence at trial, there is not a reasonable probability that the result would have been

6    different.

7        In its 2SB, the state notes that Hartnett has not opined, based on her testing, that

8    Hoang fired a weapon "with a reasonable degree of scientific certainty."  According to the

9    state, that is because even if Hartnett can conclude with a reasonable degree of scientific

10   certainty that Hoang had GSR on his hands, he may have simply been in the vicinity of a

11   weapon when it was discharged or have come into contact with an object that contained

12   GSR.   It argues that the odds were particularly high -  greater than those for an "average"

13   person – that Hoang was simply exposed to GSR, arguing that he was a "wanna be" gang

14   member for whom exposure to firearms and ammunition was common.

15       For the first time, in its 2SB, the state also challenges the reliability of Hoang's GSR

16   sampling based on timing and potential contamination.  It argues that Hoang's GSR

17   sampling occurred approximately six hours after the shooting, making the tests less reliable

18   because they occurred at the "outer limit" permissible for testing.  *See, e.g.,* 2SB, Exh. 5,

19   Summary of the FBI Laboratory's Gunshot Residue Symposium, 8 Forensic Science

20   Communications 3 (July 2006) (noting that GSR examiners vary in their opinions regarding

21   the acceptable time range for collecting sample following a shooting, and that the majority

22   agree that a four to six hour cut-off is appropriate).  The state further argues that the

23   circumstances surrounding Hoang's GSR sampling increased the possibility of its

24   contamination.  It suggests that the sample could have been contaminated in a number of

25   ways, including Hoang's contact with the actual gunman, by the fact that Hoang was a

26   possible passenger in the actual gunman's getaway car, by Hoang's transport in a squad

27   car, and by contact with arresting officers.  In support, it notes that the GSR sampling was

28   not performed at the scene of the shooting, and has submitted declarations from SJPD

officers Carpenter and Day in support of its contamination arguments.

Officer Day was present when Hoang and Giang were arrested at approximately 10:45 p.m. the night of the shooting, May 22, 1996.  He attests that neither Hoang nor Giang had their hands "bagged" before they were handcuffed.  He also attests that he transported them to the police station, at which point they were required to enter separate locked rooms.  Officer Day then removed his firearm and placed it in a locker.  He then moved the suspects into another room.  Day states that he was "unaware that [he] might wash [his] hands after handling [his] firearm and before searching suspects for weapons, or before giving them a GSR test," but does not clarify whether or not he did in fact wash his hands prior to searching Hoang and Giang.

Officer Carpenter, who also submitted a declaration with the state's 2SB, took the GSR sample from Hoang.  He states that prior to the sampling, he secured his handgun in a locker.  He also asserts that officers are not trained to wash their hands prior to taking the sample.  Carpenter attests that the processing of suspects is done in an area called "central supply where long and short guns are transferred to officers going on duty, and [going to the] indoor shooting range."

In his reply 2SB, Pham argues that the fact that there are alternate explanations for the GSR on Hoang's hands does not undermine the materiality of the evidence.  He notes that at trial, the prosecution itself conceded that if GSR had conclusively been found on Hoang's hands, that fact would be extremely significant.

Pham also contends that the state's arguments regarding the possibility of contamination are misleading.  He notes that his codefendant Nguyen called Officer Carpenter as a defense witness at trial, and that Morales, his codefendant's attorney, examined Carpenter regarding the circumstances surrounding Hoang's GSR test.  Significantly, Pham notes that the prosecution *did not* cross-examine Carpenter regarding any of the potential contamination issues alluded to in Carpenter's current declaration and in the state's 2SB.  Pham further argues that any current suggestion that Carpenter did not wash his hands or wear gloves prior to taking Hoang's GSR sample is counter to

**United States District Court**
For the Northern District of California

1    Carpenter's trial testimony.  In support, Pham submitted the instructions to the GSR kit as

2    an exhibit to his 2SB, and notes that Carpenter testified at trial that he followed those very

3    instructions, which required Carpenter to wash his hands and to wear gloves.

4          Pham further asserts that the state is wrong regarding the timing of the GSR

5    sampling.  He agrees that Hoang's GSR sample was taken at 12:15 a.m. on May 23, 1996,

6    but argues that the shooting occurred closer to 7:30 p.m. May 22, 1996, than to 7:00 p.m.,

7    as the state asserts.  Accordingly, Pham asserts that the sampling was conducted less

8    than five hours after the shooting, and would therefore have been in compliance with the

9    acceptable limits set by the FBI.  *See, e.g.,* 2SB, Exh. 5, Summary of the FBI Laboratory's

10   Gunshot Residue Symposium, 8 Forensic Science Communications 3 (July 2006) (FBI

11   uses a five hour cut-off policy in accepting GSR samples).  He further notes that the

12   sampling also must have taken place within the acceptable limits set by the Santa Clara

13   County crime lab, since that lab went ahead and performed the testing on the samples.

14         Both parties agree that because GSR particles are transferable, an expert cannot

15   definitively conclude based on GSR testing that the subject indeed fired a gun.  *See, e.g.,*

16   2SB, Exh. 5, Summary of the FBI Laboratory's Gunshot Residue Symposium, 8 Forensic

17   Science Communications 3 (July 2006).  That is because GSR tests cannot rule out the

18   fact that one who tests conclusively for GSR picked up the GSR as a bystander at the

19   scene of the crime or from a surface that contained GSR.  *See id.*  Instead,  GSR testing

20   measures the *probability* that the subject fired the gun.  *See id.*

21         Here, Hartnett's testing of Hoang's entire GSR sample rules out the possibility that

22   Hoang had something *other than GSR* on his hands as a result of another type of

23   environmental contamination, e.g., contact with brake pads or another environmental

24   source.  Accordingly, there can be no dispute that Hartnett's conclusions undermine Soto's

25   testimony at trial that it was "inconclusive" whether or not Hoang had GSR on his hands.

26   While Hartnett is unable to definitively conclude that Hoang indeed fired the weapon -

27   because no GSR test can lead to such a conclusion – the results of Hartnett's testing

28   undoubtedly reveal an increased probability that Hoang fired a weapon.

**United States District Court**
For the Northern District of California

1   The Ninth Circuit has already indicated that it found the suppressed information

2   would likely be material and prejudicial.  In its order remanding the case for further

3   discovery, the Ninth Circuit noted that "a conclusive finding of GSR [would] not prove that

4   Hoang actually fired a gun."  400 F.3d at 743.[8]  However, it nevertheless concluded that

5   such a finding "would significantly bolster the defense theory of the case."  *Id.*  The court

6   then stated that "[i]n light of the *significant* amount of other evidence tending to inculpate

7   Hoang, we cannot say that an increased probability of Hoang's having fired a gun *would be*

8   *immaterial* under *Brady.*"  *Id.* (emphasis added).  In other words, the Ninth Circuit implicitly

9   found that there was significant evidence inculpating Hoang.[9]  Accordingly, although the

10  Ninth Circuit did not explicitly state that given the current GSR results, the suppressed

11  information is material, it strongly suggested that it is.

12  Following the latest developments, the court agrees that the suppressed information

13  is material.  The post-remand discovery and further testing of Hoang's GSR sample simply

14  could not have produced any more favorable results for Pham.  The results of Hartnett's

15  testing more directly implicate Hoang by conclusively demonstrating that he had GSR on

16  his left hand.  Additionally, Hartnett's testing clearly undermines Soto's conclusion and

17  methods.

18  Presumably because it cannot challenge the accuracy of the results of Hartnett's

19  GSR testing, the state now challenges the reliability of the GSR sample based on timing of

20

21  [8]At the September 7, 2004 oral arguments, the Ninth Circuit noted that even a

22  conclusive GSR test would not show that Hoang was the gunman, but that it would have "upgraded the likelihood or the probability" that he was.  *See* Transcripts at 19-20.  The court

23  also considered the state's argument regarding the transferability of GSR, and how it can be transferred from a surface, like the actual gunman's car, to a recipient such as Hoang.  *See*

24  *id.* at 26.

25  [9]At oral argument, the court further noted that Pham's trial was one

26  where there's all this conflicting evidence, where there is strong, at least eyewitness testimony at the beginning, to the extent eyewitness testimony is

27  ever strong, to suggest that it was reasonable to believe that [Hoang] was the shooter.  Why wouldn't that be a critical factor in the jury's weighing of the

28  evidence[?].

Transcripts at 28.

United States District Court
For the Northern District of California

1  collection and the possibility of contamination.  Apparently, the state did not have the same

2  concerns with respect to the GSR samples at the time that Pham's codefendant introduced

3  the GSR evidence at trial.  During its cross-examination of SJPD Officer Carpenter, the

4  state *did not* raise any concerns regarding Carpenter's procedure in taking the sample.  Nor

5  did the state request a *Daubert* or evidentiary hearing prior to introduction of the evidence

6  at trial.  Because the state did not challenge the reliability of the evidence at the time of

7  trial, this court declines to visit the issue more than ten years later in the context of post-

8  remand supplemental briefing on federal habeas review.  Moreover, the court notes that, in

9  terms of timing, Pham is correct that the record shows that the GSR samples were taken

10  within five hours of the shooting, a time period that is in accordance with FBI guidelines.

11       Accordingly, for the above reasons, the court concludes that the lab notes and raw

12  data were material because the state's suppression of the materials undermined

13  confidence in the outcome of the trial.  Because the court has also concluded that the lab

14  notes and raw data were suppressed by the state and are exculpatory, the court GRANTS

15  Pham relief on his *Brady* claim.

16  **III.    Ineffective Assistance of Counsel Claim**

17       As noted, Pham also raised an ineffective assistance of counsel claim that is closely

18  related to his *Brady* claim, contending that his trial counsel rendered ineffective assistance

19  by failing to obtain Soto's lab notes and by failing to retain his own expert witness regarding

20  Hoang's GSR tests.  The state did not address the claim in either of its supplemental briefs,

21  asserting that this court's post-remand order for supplemental briefing applied only to the

22  *Brady* claim.[10]

23       The state is correct that this court's April 8, 2005 order reopening the case and

24  granting discovery pursuant to the Ninth Circuit's remand order, ordered re-briefing only as

25  to petitioner's *Brady* claim.  It was unclear at the time the court issued that order, though,

26  what Soto's lab notes would reveal.  Nor was it apparent at that point that further testing of

27  _____

28       [10]Given that Pham did not refer to this claim in his reply 2SB after conceding that his
counsel had indeed sought a court order for the notes, the court could reasonably conclude
that Pham has abandoned this claim.

**United States District Court**
For the Northern District of California

1  the GSR samples themselves would be appropriate, or what further testing would reveal.[11]

2      There can be no question that the post-remand developments in this case impact

3  Pham's ineffective assistance of counsel claim.  This is especially true given the fact that

4  this court's analysis and resolution of the prejudice prong under the *Strickland* must be

5  identical to that with respect to Pham's *Brady* claim.  Accordingly, given the developments

6  in this case, the court finds it necessary to reconsider its October 20, 2003 order denying

7  Pham's ineffective assistance of counsel claim.

8      **A.   Legal Standard**

9      The Sixth Amendment guarantees the right to assistance of counsel.  U.S. Const.

10  amend. VI; *Strickland*, 466 U.S. at 685.  "[T]he right to counsel is the right to the effective

11  assistance of counsel."  *Id.* at 686 (quoting *McMann v. Richardson*, 397 U.S. 759, 771, n.

12  14 (1970)).  "An ineffective assistance claim has two components:  A petitioner must show

13  that counsel's performance was deficient, and that the deficiency prejudiced the defense."

14  *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland*, 466 U.S. at 687).  The court

15  is not required to find counsel's performance deficient before considering whether the

16  performance prejudiced petitioner's defense.  *Strickland*, 466 U.S. at 697.  If the petitioner

17  makes an insufficient showing of either component, the court does not have to consider the

18  other.  *Id.*  Specifically, "[i]f it is easier to dispose of an ineffectiveness claim on the ground

19  of lack of sufficient prejudice, . . . that course should be followed."  *Id.*

20      To establish deficient performance, a petitioner must demonstrate that counsel's

21  representation fell below an objective standard of reasonableness."  *Wiggins*, 539 U.S. at

22  521.  The Supreme Court has "declined to articulate specific guidelines for appropriate

23  attorney conduct and instead ha[s] emphasized that the proper measure of attorney

24  performance remains simply reasonableness under prevailing professional norms."  *Id.*

25  Thus, the reasonableness of counsel's conduct must be measured against the professional

26  norms prevailing at the time of counsel's representation.  *See Rompilla v. Beard*, 545 U.S.

27   

28      [11]This court's July 17, 2006 order for supplemental briefing following Hartnett's testing of Hoang's GSR sample was more general regarding the scope of supplemental briefing following test completion than the court's April 8, 2005 order.

374, 386-87 (2005) (citing American Bar Association Standards for Criminal Justice in circulation at time of defendant's trial); *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003) (citing American Bar Association professional standards and standard practice in capital defense at pertinent time).

Judicial scrutiny of counsel's performance must be highly deferential, and review must start with a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689. In addition, a determination of the reasonableness of defense counsel's conduct is based on facts of the particular case viewed from the time of counsel's conduct. *Id.*, 466 U.S. at 690. Thus, the relevant inquiry is not what defense counsel could have done, but rather whether the choices made by defense counsel were reasonable. *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). Therefore, a claim of ineffective assistance of counsel requires an identification of the acts or omissions of counsel that are alleged to have been objectively unreasonable. *Strickland*, 466 U.S. at 690.

As stated above, the same "reasonable probability" standard governs *Strickland* "prejudice" and *Brady* "materiality." *Benn*, 283 F.3d at 1053. In order to grant relief for either type of claim, the court must determine that there is a reasonable probability that, but for the constitutional violation, the result of the proceeding would have been different. *See e.g.*, *Strickland*, 466 U.S. at 694 ("a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"); *Kyles*, 514 U.S. at 433 ("a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"); *Bagley*, 473 U.S. at 682 (*Strickland's* reasonable probability standard appropriate for claims alleging suppression of exculpatory evidence); *see generally Strickler*, 527 U.S. at 297-299 (Souter J.) (describing the evolution of the Brady "reasonable probability" standard, noting that it originated in *Strickland*, and further noting that *Strickland* cited *Agurs*, which involved a *Brady* claim, for the "reasonable probability" standard); *Kyles*, 514 U.S. at 434 (*Bagley* Court adopted the *Strickland* "reasonable probability" standard for *Brady* materiality).

United States District Court
For the Northern District of California

1

   **B.    Deficient Performance**

2       Because this court has already concluded that the suppressed evidence is material

3  and prejudicial in conjunction with Pham's *Brady* claim, it need not address prejudice in

4  conjunction with the instant claim because, assuming counsel's performance was deficient,

5  the result would be the same.

6       Turning to Pham's trial counsel, Schwartz's performance, in his opening 2SB, Pham

7  argues that Schwartz "did nothing" after the state failed to disclose Soto's notes as

8  requested by Schwartz's letter to the prosecutor.  Pham contends that Schwartz's failure to

9  "follow through" and to seek a court order to obtain them was deficient.  He asserts that

10  "[w]hen the state did not comply with counsel's initial request, counsel should have sought

11  court process to obtain the notes." 2SB Opening Br. at 18.

12       However, as discussed in more detail above, Pham conceded in his reply 2SB, and

13  the record confirms, that his trial counsel did indeed file a motion in limine with the trial

14  court, which requested disclosure of Soto's notes, among other things.   Assuming that

15  Pham's trial counsel did not receive Soto's notes as a result of his informal request to the

16  prosecution and his motion filed with the trial court, it is unclear what more his trial counsel

17  could have done in an attempt to obtain Soto's raw data and notes.  Given the record in this

18  case, Schwartz's performance, including his efforts to obtain the suppressed materials, was

19  objectively reasonable.

20       For these reasons, the court DENIES Pham's claim for relief based on ineffective

21  assistance of counsel.

22  **IV.    Jury Instruction Claim**

23       Because this court's October 20, 2003 resolution of Pham's jury instruction claim is

24  unchanged by the post-remand evidentiary development and re-briefing, the court declines

25  to reconsider the issue at this time.

26                          **CONCLUSION**

27       For the above reasons, the court GRANTS habeas relief on Pham's *Brady* claim,

28  and DENIES relief as to Pham's claim for ineffective assistance of counsel.  The court

1   declines to reconsider its prior October 20, 2003 order denying Pham habeas relief as to

2   his jury instruction claim.  Because the court grants relief on Pham's *Brady* claim, his

3   request for an evidentiary hearing is mooted.

4          Accordingly, Pham's conviction is VACATED.  The respondent shall release

5   petitioner from custody unless the state commences proceedings to retry petitioner within

6   120 days of the date of entry of judgment on this order.

7          The clerk shall send an informational copy of this order to the district attorney of

8   Santa Clara County, in addition to the usual service on counsel of record.

9

10  **IT IS SO ORDERED.**

11

12  Dated: March 20, 2008

13

14                                          _____
                                            PHYLLIS J. HAMILTON
                                            United States District Judge